# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| LARRY PEACOCK, MIKE WILSON, and the TENNESSEE VALLEY PAINTERS' HEALTH FUND, | ) ) ) ) | |
| Plaintiffs, | ) ) | NO. 3:24-cv-01369 |
| v. | ) ) | JUDGE CAMPBELL |
| | ) | MAGISTRATE JUDGE FRENSLEY |
| C3 INDUSTRIAL BLASTING AND COATINGS, INC., and KELLY BAKER HENDERSON, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM AND ORDER</u>

For the reasons stated herein, Plaintiffs' pending motion for summary judgment (Doc. No. 53) is **GRANTED** as to Defendant C3 Industrial Blasting and Coatings, Inc.'s liability and **DENIED** in all other respects.

### I. FACTUAL BACKGROUND

Plaintiffs bring the present enforcement action under the Employee Retirement Income Security Act of 1974 ("ERISA") against Defendant C3 Industrial Blasting and Coatings, Inc. ("C3"), an industrial blasting and coatings company based in Knoxville, Tennessee. (Pl. SOF ¶ 1). Defendant Kelly Baker Henderson ("Henderson") and her husband are the owners of C3, and Henderson is personally involved in the day-to-day operations and financial management of the company. (Pl. SOF ¶ 19; Henderson's Second Declaration, Doc. No. 49 ¶ 4).

C3 hires union painters referred for employment by Local 437 the International Union of Painters and Allied Trades ("Local 437") as well as non-union painters and subcontractors as sources of labor for painting jobs. (Pl. SOF ¶ 5). At all relevant times, C3 has been signatory to two collective bargaining agreements, the Collective Bargaining Agreement with Local 437

("CBA") (Doc. No. 55-3), and the Construction Labor Agreement ("CLA") (Doc. No. 55-2) (collectively the "CBAs") with the Knoxville Building and Construction Trades Counsil, of which Local 437 is a member. (Pl. SOF ¶ 2).

The CLA covers painting and other construction trade work performed on U.S. Department of Energy sites in Oak Ridge, Tennessee:

> **Section** 1. This Agreement shall apply and be limited to construction and construction-like work (dismantling, demolition and decontamination for continued or future use) and nothing contained herein shall be construed to prohibit, restrict or interfere with the performance of any other operations, work or function which may occur at the project site or be associated with the development of the project. The scope of the work covered by this Agreement is restricted to work performed on the projects and shall consist of two Divisions[.]
>
> **Section** 2. This agreement shall apply to all signatory Employers, their Subcontractors and their lower tier Subcontractors when they are performing work within the scope described in this Article on the DOE Oak Ridge facilities, except where specifically excluded by DOE.

(CLA, Article II, Doc. No. 55-2 at 3; *see also* Pl. SOF ¶ 3).

The CBA covers painting and other trade work performed both inside and outside of the geographic jurisdiction of Local 437:

> The geographic jurisdiction of the Union party to this Agreement is Knoxville, Tennessee and surrounding areas:
>
> Tennessee
> Anderson, Blount, Campbell, Carter, Claiborne, Cocke, Cumberland, Fentress, Grainger, Greene, Hamblen, Hancock, Hawkins, Jefferson, Johnson, Knox, Loudon, Monroe, Morgan, Roane, Scott, Sevier, Sullivan, Unicoi, Union, and Washington
>
> Virginia
> Lee, Scott, Washington
>
> Kentucky
> Bell, Clay, Clinton, Harlan, Knox, Laurel, Leslie, Letcher, McCreary, Perry, Wayne, and Whitley

2

Section 1. The Contractor or the Employer party to this agreement, when engaged in work outside the geographical jurisdiction of the Union party to this agreement, shall employ not less than fifty percent (50%) of the workers employed on such work from among the residents of the area where the work is performed, or from among persons who are employed the greater percentage of their time in such area; provided that the first employee on any such job or project shall be selected by the Employer from any geographic jurisdiction.

Section 2. The Employer party hereto shall, when engaged in work outside the geographic jurisdiction of the Union party to the Agreement, comply with all of the lawful clauses of the Collective Bargaining Agreement in effect in said other geographic jurisdiction and executed by the Employers of the industry and the IUPAT affiliated Local Unions in that jurisdiction, including, but not limited to, the wages, hours, working conditions, fringe benefits, and procedure for settlement of grievances set forth therein; *provided, however, that where no affiliated Union has a current effective Agreement covering such out-of-area work, the Employer shall perform such work in accordance with this Agreement; and provided, further, that as to employees employed by such Employer from within the geographic jurisdiction of the Union party to this Agreement and who are brought into an outside jurisdiction, such employees shall be entitled to receive the wages and conditions including fringe benefits effective in either the home or outside jurisdiction, whichever are more favorable to such employees.* In situations covered by the last proviso, fringe benefit contributions on behalf of such employees shall be made solely to their home funds in accordance with their governing documents, and the difference between the wages and benefit contributions required by the away funds and the home funds, if any, shall be paid to the employees as additional wages. This provision is enforceable by the District Council or Local Union in whose jurisdiction the work is being performed, both through the procedure for settlement of grievances set forth in its applicable Collective Bargaining Agreement and after exhaustion of those procedures, through the Courts, and is also enforceable by the Union party to this Agreement, both through the procedure for settlement of grievances set forth in this Agreement and after exhaustion of those procedures, through the Courts.

(CBA, Doc. No. 55-3 at 3-4) (emphasis added).

3

Article 2 of the CBA – Scope of Bargaining Unit and Work Jurisdiction – provides:

> This Agreement shall apply to all employees performing the work of journeypersons or apprentices in the classification of "painter" for the Employer. In addition, whether or not specifically referenced herein, this Agreement also applies to all employees performing any trade jurisdiction work identified and described in this Article.
>
> Within the meaning of this provision, the work of the "painter" will include, but not be limited to: (1) preparation, application and removal of all types of coatings and coating systems in relation to all painting, decorating, protective coatings, coating and staining of concrete floors and toppings, waterproofing, masonry restoration, fireproofing, fire retarding, metal polishing, refinishing, ceiling, lining, fiber glassing, E-glass fiberglass, carbon fiber, encapsulating, insulating, metalizing, flame spray, the application of exterior insulating finishing systems; (2) each and all such applications, and similar or substitute applications, on all surfaces, interior and exterior, to include, but not be limited to: residences, buildings, structures, industrial, power, chemical and manufacturing plants, bridges, tanks, vats, pipes, stacks, light and high tension poles, parking, traffic and air strip lines, trucks, automobile and railroad cars, ships, aircraft, and all machinery and equipment; (3) any and all material used in preparation, application or removal of any paint, coatings or applications, including, but not limited to: the handling and use of thinners, dryers, sealers, binders, pigments, primers, extenders, air and vapor barriers, emulsions, waxes, stains, mastics, plastics, enamels, acrylics, epoxies, epoxy injection and T-lock welding, alcalyds, sheet rubber, foams, seamless and tile-like coatings, etc.; (4) all preparation for and removal of any and all materials for finishes, such as deep cleaning, patching, all levels of finishing, taping/finishing, skimcoating, pointing, caulking, high-pressure water, chemical and abrasive blasting, environmental blasting, wet/dry vacuum work, chemical stripping, scraping, air tooling, bleaching, steam-cleaning, asbestos and lead abatement/removal; (5) the inspection of all coatings and/or coating systems during their applications will be performed by the painter.

(CBA, Doc. No. 55-3 at 2-3).

Article X of the CLA obligates C3 to make payments to the Plaintiff Fund for each painters' work hours and to follow the Fund's governing documents:

> **Section 1**. The hourly wage rates and fringe benefits paid employees covered by this agreement shall be the hourly wage rates and fringe benefits in effect on this date, October 1, 2016, as contained in Attachment 1.

4

**Section 2**. Future hourly wage rates and fringe benefit adjustments, effective May 1 of 2017 and for each succeeding year, will be determined by the Union/Management Administrative Committee using the average wage and fringe benefit adjustment as arrived at by the Construction Labor Research Council (CLRC) Southeast States Survey. This adjustment will be determined at least sixty (60) days prior to May 1, 2017 and each succeeding year thereafter.

**Section 3**. The Employer adopts and agrees to be bound by the written terms of legally established fund trust agreements specifying the detailed basis on which payments are to be made into, and benefits paid out of, such trust funds. The Employer authorizes the parties to such trust agreements to appoint trustees and successor trustees to administer the trust funds and hereby ratifies and accepts the trustees so appointed as if made by the Employer. Nothing contained in this Section is intended to require the Employer to become a party to nor be bound by a local collective bargaining agreement except for the Employee benefit fund contributions as required herein, nor is the Employer required to become a member of any employee group or association as a condition for making such contributions.

**Section 4**. Industry promotion or administrative funds or other funds which do not accrue to the direct benefit of employees, covered by this Agreement, are not considered fringe benefits for purposes of this Agreement and will not be surveyed for future adjustments, and need not be paid by the Employer.

**Section 5**. The Employer agrees that it will, when requested by the Union, deduct from the pay of each employee, who is at the time a member of the Union, or made application to become a member of the Union, current Union working dues from the gross wages. These deductions shall be deducted upon presentation of a proper legal payroll deduction authorization signed by said employee requesting such deduction, and remitted monthly by the 15" of the following month, the aggregate amount of such deduction directly to the respective local Union.

**Section 6**. Fringe benefit payments shall be paid only on the basis of hours worked, not hours paid for, except where this is in violation of existing applicable trust agreements, in which case the provisions of existing applicable trust agreements will prevail.

**Section 7**. All employees covered by this Agreement shall be paid weekly, by check before the end of their regular shift. When an employee cannot be paid accordingly because of a holiday, he/she shall be paid on his/her last shift

5

before the holiday. Employees affected by layoff (reduction in force) shall be paid in full upon termination. Alternate payment proposals can be developed through the Union/Management Administrative Committee.

(CLA, Doc. No. 55-2 at 13-14).

Section 3 of Article 13 of the CBA obligates C3 to make payments to the Plaintiff Fund for each painters' work hours – without distinction between union and non-union members – and to follow the Fund's governing documents:

1. Commencing with the 1st Day of September 2022, and for the duration of the Agreement, and any renewals or extension thereof, the Employer agrees to make payments to the IUPAT National Pension Fund, the District Council No.77 Health & Welfare Fund, the District Council No.77 FTI Fund, for each employee covered by this Agreement, as follows:

a) For each hour or portion thereof for which an employee receives pay, the Employer shall make a contribution in the amount(s) set forth Article 32 of this Agreement.

b) For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and other hours for which pay is received by the employee or payable by the Employer in accordance with the Agreement, shall be counted as hours for which contributions are payable.

c) Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this agreement. This includes, but is not limited to, apprentices, helpers, trainees, and probationary employees.

d) The payments to the IUPAT National Pension Fund, Health & Welfare Fund, and District Council 77 FTI Fund, required above shall be made separately to each respective Fund or as otherwise set forth in written instructions that the Employer shall receive from the Administrators of each Fund. The Employer hereby understands, accepts, and agrees to be bound by all provisions set forth in the Agreement and Declaration of Trust that has been adopted by the parties to each of the respective Trust Funds identified above, including all amendments and modifications made thereto, and the Employer agrees to be bound by and to said

6

Agreements and Declarations of Trust, as amended from time to time, as though it had actually signed the same.

2. The Employer hereby irrevocably designates as its representatives on the Board of Trustees of each Trust Fund identified above, such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors. The Employer further agrees to be bound by all actions taken by the Trustees pursuant to the said Agreement and Declaration of Trust, as amended from time to time.

3. All contributions shall be made at such time and in such manner as the Trustees require; and the Trustees of each respective Fund may at any time conduct an audit in accordance with provisions set forth in the Agreement and Declaration of Trust or other rules and regulations that may, from time to time, be adopted by the Trustees.

4. If the Employer fails to make contributions to one or more, or any of these Funds within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, and any other provisions hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collection of the payments due, together with attorneys' fees and such penalties as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no strike" clause that may be provided or set forth elsewhere in this Agreement, and such provisions shall not apply in the event of a violation of this clause.

5. Each said Fund and each benefit plan adopted by the Trustees shall at all times conform with the requirements of the Internal Revenue Code so as to enable the Employer at all times to treat contributions to said Fund as a deduction for income tax purposes.

(CBA, Doc. No. 55-3 at 13-14).

Section 4 of Article 13 of the CBA provides that:

1. Commencing with the 1" day of September 2022, and for the duration and any renewal of this Agreement, the EMPLOYER agrees to make payments to The International Union of Painters and Allied Trades District Council No. 77 Labor-Management Fund ("Fund") for each EMPLOYEE covered by this Agreement, as follows:

2. For each hour or portion thereof, for which an EMPLOYEE receives pay, the EMPLOYER shall make contributions of $.10 to the Fund.

7

3. For the purpose of this Article, each hour worked for, including hours attributable to show up time, and other hours for which pay is received by the EMPLOYEE in accordance with the Agreement, shall be counted as hours for which contributions are payable.

4. Contributions shall be paid on behalf of any EMPLOYEE starting with the EMPLOYEE'S first day of employment in a job classification covered by this Agreement.

5. The EMPLOYER and Union signatory to this Agreement agrees to be bound by and to the Agreement and Declaration of Trust, as amended from time to time, establishing the Fund. 6. The EMPLOYER hereby irrevocably designates as its representatives on the Board of Trustees such Trustees as are now serving, or who will in the future serve, as EMPLOYER Trustees, together with their successors.

7. All contributions shall be made at such time and in such manner, as the Trustees require and the Trustees may at any time conduct an audit in accordance with the Agreement and Declaration of Trust.

8. If an EMPLOYER fails to make contributions to the Fund within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the EMPLOYER shall be liable for all costs of collection of the payments due together with attorney fees and such liquidated damages as may be assessed by the Trustees. The EMPLOYER'S liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause which may be provided or set forth elsewhere in this Agreement."

(CBA, Doc. No. 55-3 at 14).

Article XVI of the CLA obligates C3 to apply the terms of the CLA to subcontractors it hires to do painting work:

Section 1. Any Subcontractor, of whatever tier, performing covered work on these project sites shall become signatory to this Agreement. Such Subcontractor shall indicate his/her acceptance of the terms and conditions of this Agreement by signing the Agreement and by delivering a copy to the appropriate Union(s) prior to commencement of work on a project site. All Subcontractors, of whatever tier, will arrange and conduct a pre-job conference with the signatory Unions prior to starting their work on a project. Work will not proceed in the event that a pre-job conference is not arranged and held.

> Section 2. All Subcontractors will be required to pay a total wage and benefit package as contained in Article X of this Agreement through the duration of their work on the project and will provide certified payrolls to the appropriate Employer's Contract Administrator which will be available to the Union upon request.

(CLA, Doc. No. 55-2 at 17).

Article 24 of the CBA obligates C3 to apply the terms of the CBA to subcontractors it hires to do painting work:

> Section 1. The Employer shall not contract out, subcontract, or outsource work to be done at the site of the construction, alteration, painting, or repair of a building or structure or other work unless the Employer or person who will perform such work is a party to a Collective Bargaining Agreement with this Union or another Union affiliated with the IUPAT.

> Section 2. In the event that the Employer shall contract out, subcontract, or outsource any bargaining unit work, whether or not job site or other work encompassed by Section 1 here-of, the Employer must notify the Union as to the identity of the contractor or subcontractor to which the work will be assigned within 30 days prior to finalizing any agreement with such contractor, subcontractor, or other person.

> Section 3. In the event of contracting, subcontracting, or outsourcing of any job site work encompassed by the provisions set forth in Section 1 hereof, if the Union has provided the Employer with written notice that a contractor is presently delinquent in making contributions to the Union or any fringe benefit fund to which contributions are required by this Agreement, and, after being provided such written notice, the Employer nonetheless enters into or continues a contract for the performance of any job site work that is covered by this Agreement with such delinquent contractor, the Employer shall be liable for any unpaid fringe benefit contributions owed by such contractor because of the performance of such job site (or other) work pursuant to that contract.

(CBA, Doc. No. 55-3 at 20).

C3 subcontracted with Blais Paperhanging, a non-signatory subcontractor, to do painting work for it on the Veterans' Home project in Cleveland, Tennessee. (Pl. SOF ¶ 11). C3 was hired by the general contractor, Christman, to do a broad scope of painting work on the project. (*Id.*). C3 subcontracted with Volunteer Floor Coatings, a non-signatory subcontractor, to do painting work for it on the X-Energy project in Oak Ridge, Tennessee. (*Id.* ¶ 12). The general contractor on the

9

Hard Rock Casino project in Bristol, Virginia hired C3 to do a broad scope of painting work on the project, which C3 then subcontracted J. Ross Conglomerate, a non-signatory painting company, to perform. (*Id*. ¶ 13). C3 subcontracted with Allen Painting & Drywall, a non-signatory subcontractor, to do painting work for it on the ECU Stadium project in Greenville, North Carolina. (*Id*. ¶ 14).

In 2023, C3 was notified that the Fund had engaged an auditor to audit C3's payroll. (Doc. No. 63-1 ¶ 8). C3 received a copy of the audit report, which identified discrepancies in C3's payroll compliance. (*Id*. ¶ 10). On February 28, 2025, C3 made a "catch-up" payment of past-due contributions. (*Id*. ¶ 31). In or around November 2025, C3 received an additional audit report, including the period of April 1, 2023, through September 30, 2025. (*Id*. ¶ 11).

## II.     STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "The standard that a movant must meet to obtain summary judgment depends on who will bear the burden of proof at trial." *Trustees of Iron Workers Defined Contribution Pension Fund v. Next Century Rebar, LLC*, 115 F.4th 480, 488 (6th Cir. 2024) (citation modified).  "Where the moving party has the burden of proof his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Id*. at 488–89 (citation modified). "Put differently, when the moving party bears the burden of proof, their initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Id*. at 489 (citation modified).

In evaluating a motion for summary judgment, the court views the facts in the light most favorable for the nonmoving party, and draws all reasonable inferences in favor of the nonmoving

10

party. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper jury question. *Id*.

## I. LAW AND ANALYSIS

ERISA governs employee benefit funds, regulates their maintenance, and protects workers' interests in them. *See* 29 U.S.C. § 1001(a). Although ERISA is a complex statute, its purpose is simple: to establish a uniform regulatory regime for plan administration that protects monies belonging to plan beneficiaries while such funds are held and managed by others. *See Trustees of Sheet Metal Workers Local 7 Zone 1 Pension Fund v. Pro Services, Inc.*, 65 F.4th 841, 847 (6th Cir. 2023). "Collective-bargaining agreements that establish ERISA plans are interpreted by use of ordinary contract principles to the extent those principles are not inconsistent with federal labor policy." *Trustees of Iron Workers*, 115 F.4th at 490. If a contract is in writing and its terms are clear and unambiguous, a court ascertains the contract's meaning in accordance with the contract's plainly expressed intent. *See id*. If a term of a provision in an ERISA plan is ambiguous, courts resolve ambiguities in the insured's favor because doing so aligns with ERISA's goals to promote the interests of employees and their beneficiaries in employee-benefit plans and to protect contractually defined benefits. *See id*.

### A. C3

1. Liability

Plaintiffs contend C3 was obligated to make fringe benefit contributions under the CLA and CBA. ERISA provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms

11

of a collectively bargained agreement shall, to the extent not
inconsistent with law, make such contributions in accordance with
the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.

Section 502(g) of ERISA, gives funds a cause of action to enforce Section 515's duties

against "employers who are delinquent in meeting their contractual obligations." *Operating

Engineers' Local 324 Fringe Benefit Funds v. Rieth-Riley Construction Co., Inc.*, 43 F.4th 617,

619 (6th Cir. 2022) (quoting *Laborers Health & Welfare Tr. Fund for N. Cal. v. Advanced

Lightweight Concrete Co.*, 484 U.S. 539, 547 (1988)). Plaintiffs have submitted evidence that C3

failed to make all contributions to the Plaintiff Fund required by the CBAs, and that its foregoing

breach is undisputed. (*See* Doc. Nos. 56, 56-1, 56-2 (audit reports); *see also* Doc. No. 63-1 ¶ 31

(acknowledging that C3 made a "catch-up" payment of past-due contributions in February 2025)).

Defendants submit no evidence or argument disputing Plaintiffs' claim that C3 failed to make all

contributions to the Plaintiff Fund required by the CBAs. Accordingly, Plaintiffs have met their

burden of demonstrating no genuine issue of material fact as to C3s' liability.

2. <u>Relief</u>

Having found liability, the Court turns to the question of relief:

In any action under this subchapter by a fiduciary for or on behalf
of a plan to enforce section 1145 of this title in which a judgment in
favor of the plan is awarded, the court shall award the plan—

    A. the unpaid contributions,

    B. interest on the unpaid contributions,

    C. an amount equal to the greater of—

        i.    interest on the unpaid contributions, or

        ii.    liquidated damages provided for under the plan in an
amount not in excess of 20 percent (or such higher
percentage as may be permitted under Federal or

State law) of the amount determined by the court under subparagraph (A),

D. reasonable attorney's fees and costs of the action, to be paid by the defendant, and

E. such other legal or equitable relief as the court deems appropriate.

29 U.S.C. § 1332(g)(2). Under this provision, Plaintiffs seek a total of "$480,858.55, which figure is inclusive of delinquent contributions, liquidated damages, and interest." (Doc. No. 54 at 15).

### i. Unpaid contributions

Plaintiffs provide proof that C3 owes $322,712.29 in delinquent contributions during the audit period from 2019-2025. (*Id*. (citing Cooper Declaration, Doc. No. 56 ¶ 3 and Exhibits 1 and 2; Renolds Declaration, Doc. No. 44 ¶ 6)). ERISA requires employers to maintain adequate records. 29 U.S.C. § 1059(a)(1). As noted above, Plaintiffs rely on audits to show that C3 has not met its contribution obligations. If an employer fails to maintain adequate records regarding its employees' work as required by ERISA, then the results of such an audit are presumptively accurate. *Mich. Laborers' Health Care Fund v. Grimaldi Concrete*, 30 F.3d 692, 696 (6th Cir. 1994). This is because when an employer violates ERISA's recordkeeping duty and a plaintiff shows that at least "some [CBA-]covered work was performed," the employer is presumed liable for contributions on all work at issue and bears the burden to show what work was not covered under the CBA. *See id*. at 697. Here, C3 has provided no records at all with respect to the work performed under the CBAs. Accordingly, it is presumed liable for contributions on all work at issue and bears the burden to show what work was not covered under the CBA. *See id*.

C3 claims it was not required to make contributions for work performed outside of the geographic scopes of the CBAs. However, this contention fails under the plain language in Article 3 of the CBA, which provides that C3's employees who performed covered work outside the geographic jurisdiction, are still "entitled to receive the wages and conditions including fringe

13

benefits effective in either the home or outside jurisdiction, whichever are more favorable to such employees." C3 is also incorrect to the extent it claims the scope of the CLA and CBA are mutually exclusive. For example, while the scope of the CLA is limited to work on the DOE Oak Ridge facilities, work performed in Oak Ridge at a non-DOE facility is still within the scope of the CBA because Oak Ridge spans Anderson and Roane counties, which are expressly included within the scope of the CBA. *See supra*. And C3's contention that it was not required to make contributions for all hours worked by all painters employed through subcontractors is belied by the plain language in the CBAs:

> Section 1. Any Subcontractor, of whatever tier, performing covered work on these project sites shall become signatory to this Agreement. Such Subcontractor shall indicate his/her acceptance of the terms and conditions of this Agreement by signing the Agreement and by delivering a copy to the appropriate Union(s) prior to commencement of work on a project site. All Subcontractors, of whatever tier, will arrange and conduct a pre-job conference with the signatory Unions prior to starting their work on a project. Work will not proceed in the event that a pre-job conference is not arranged and held.
>
> Section 2. All Subcontractors will be required to pay a total wage and benefit package as contained in Article X of this Agreement through the duration of their work on the project and will provide certified payrolls to the appropriate Employer's Contract Administrator which will be available to the Union upon request.

(CLA, Doc. No. 55-2 at 17).

> Section 1. The Employer shall not contract out, subcontract, or outsource work to be done at the site of the construction, alteration, painting, or repair of a building or structure or other work unless the Employer or person who will perform such work is a party to a Collective Bargaining Agreement with this Union or another Union affiliated with the IUPAT.
>
> Section 2. In the event that the Employer shall contract out, subcontract, or outsource any bargaining unit work, whether or not job site or other work encompassed by Section 1 here-of, the Employer must notify the Union as to the identity of the contractor or subcontractor to which the work will be assigned within 30 days prior to finalizing any agreement with such contractor, subcontractor, or other person.

14

Section 3. In the event of contracting, subcontracting, or outsourcing of any job site work encompassed by the provisions set forth in Section 1 hereof, if the Union has provided the Employer with written notice that a contractor is presently delinquent in making contributions to the Union or any fringe benefit fund to which contributions are required by this Agreement, and, after being provided such written notice, the Employer nonetheless enters into or continues a contract for the performance of any job site work that is covered by this Agreement with such delinquent contractor, the Employer shall be liable for any unpaid fringe benefit contributions owed by such contractor because of the performance of such job site (or other) work pursuant to that contract.

(CBA, Doc. No. 55-3 at 20).

However, C3 has filed proof that at least one of its employees covered in the audit performed non-covered work. (*See* Henderson Deposition at 114). Accordingly, C3 has created a material question of fact as to the accuracy of the unpaid contribution amount submitted by Plaintiffs. Therefore, summary judgment is **DENIED** as to the amount of unpaid contributions.

### ii. Liquidated damages

Under ERISA, liquated damages are recoverable if a plan provides for them "in an amount not in excess of 20 percent." 29 U.S.C. § 1132(g)(2)(C)(ii). Here, the CBA provides for liquidated damages against the employer if it fails to make required contributions to the Fund within twenty (20) days after the date required by the Trustees. (*See* CBA, Doc. No. 55-3 at 14). And Plaintiffs submit proof that the Fund's administrator has calculated the liquidated damages and interest due on C3's delinquency as totaling $160,858.55. (*See* Doc. No. 54 at 15 (citing Reynolds Declaration, Doc. No. 44 ¶ 7)). Although Defendants do not argue against Plaintiffs' request for liquidated damages, the Court's finding of material disputes of fact as to the amount of unpaid contributions precludes summary judgment as to the amount of liquidated damages and interest. Accordingly, summary judgment is **DENIED** as to the amount of liquidated damages and interest.

### B. Henderson

Plaintiffs seek to hold Henderson personally liable for C3's failure to make the contributions to the Plaintiff Fund as required by the CBAs because, as an owner and primary decision maker of C3, she chose to divert contributions that were due to the Fund for other business expenses. (*See* Doc. No. 54 at 14). However, Henderson submitted a declaration denying that she had ever "diverted contributions due to the Fund for other business expenses" or "made any interest-free loans to C3 out of Fund assets." (Doc. No. 63-1 ¶ 33).

While Henderson's foregoing testimony appears to be based on her incorrect reading of the CBAs as not requiring contributions for work performed in certain locations or by subcontractors and non-union employees, the Court cannot draw such negative factual inferences against a non-moving party. And Plaintiffs have not come forward with proof of Henderson's purported diversions. Rather, viewing the facts in the light most favorable to Henderson (as the non-moving party), there is a genuine issue of material fact as to whether she paid other creditors or entities instead of paying contributions owed to the Fund. Accordingly, Plaintiffs' motion for summary judgment is **DENIED** as to Henderson.

## II.     CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment (Doc. No. 53) is **GRANTED** in part and **DENIED** in part.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE